# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* [UNDER SEAL]<br><br>     *Plaintiff,*<br><br>v.<br><br>[UNDER SEAL]<br><br>     *Defendants.* | **Case No.**<br><br>**Complaint for Violations of the Federal False Claims Act, 31 U.S.C. §§ 3729 et seq.**<br><br>**FILED UNDER SEAL**<br><br>**Jury Trial Demanded** |

**CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT**

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA, *ex rel.*
DAWN HAMROCK, AND DAWN HAMROCK
INDIVIDUALLY,

  *Plaintiffs,*

v.

SOUTHERNCARE, INC.

  *Defendant.*

**Case No.**

**Complaint for Violations of the
Federal False Claims Act, 31
U.S.C. §§ 3729 et seq.**

**FILED UNDER SEAL**

**Jury Trial Demanded**

## INTRODUCTION

1. This is a *qui tam* action brought by Relator Dawn Hamrock ("Ms. Hamrock" or "Relator"), on her own behalf and on behalf of the United States of America ("United States") against Defendant SouthernCare, Inc. ("SouthernCare" or "Defendant,") to recover damages, penalties, attorneys' fees and other relief owed to the United States and Relator for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 et seq., ("FCA" or "False Claims Act").

2. In connection with the receipt of reimbursement from the United States Department of Health and Human Services ("HHS"), Centers for Medicare and Medicaid Services ("CMS"), Defendants committed fraud against the Medicare Program by: (a) knowingly presenting, and/or causing to be presented, to an officer and employee of the United States Government false and fraudulent claims for payment and approval; (b) knowingly making, using, and/or causing to be made and used, false records and statements material to a false claim; (c) knowingly making, using, and/or causing to be made or used, false records or statements

**CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT**

material to an obligation to pay or transmit money or property to the Government, and knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government; and (d) conspiring to commit the foregoing violations.  This conduct violates 31 U.S.C. §§ 3729(a)(l)(A), (B), (G)[1], and (C) respectively.

3.      As is detailed herein, Defendant also engages in a pattern of conduct that violates the Anti-Kickback Statute 42 U.S.C. § 1320a-7b ("AKS") Defendants' violations of the AKS give rise to additional liability under the FCA.

4.      Specifically, SouthernCare routinely engages in the following conduct that results in the submission of false claims and false records material to a false claim:

- Certifying patients as eligible for the Medicare and Medicaid hospice benefit when those patients are not eligible for the benefit because they are not terminally ill;

- Recertifying patients as continuing to be eligible for the Medicare and Medicaid hospice benefit when in fact at the time of the recertification those patients are not terminally ill and therefore do not qualify for continuing hospice services funded by Medicare or Medicaid;

- Submitting claims for upcoded levels of care to obtain higher reimbursement;

- Conspiring with healthcare providers to submit upcoded levels of care to obtain higher reimbursement;

- Providing in-kind kickbacks to healthcare professions with the intent to induce referrals of hospice patients incurred by Medicare or Medicaid;

---

[1] For all unlawful conduct for which SouthernCare is liable under this Count that occurred on or before May 20, 2009, the date on which Congress amended and renumbered the Federal False Claims Act pursuant to the Fraud Enforcement and Recovery Act ("FERA"), Pub.L.No. 111-21, §4, 123 Stat. 1617, 1621 (2009), this Complaint should be deemed to include violations of the FCA prior to the FERA amendments, specifically, 31 U.S.C. §3729(a)(1), (2) and (7).

**CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT**

- Engaging in other conduct detailed herein.

5.     Defendant is a private, for-profit hospice chain. Defendant's conduct alleged herein has not only defrauded the United States by and though its violations of the FCA, the AKS and other laws, but it conduct is all the more egregious because the company has defrauded the United States through repeated violations of a 2009 Corporate Integrity Agreement signed with the Department of Justice that was designed to halt SouthernCare's systemic pattern and unlawful practice of: enrolling and re-certifying non-terminal patients; providing inadequate services and other violations of the Medicare Conditions of Participation; violating the Anti-Kickback Statute ("AKS"); and conspiring to defraud the government. However, SouthernCare never ceased this conduct despite executing the Corporate Integrity Agreement and in fact continues this conduct at this time.

## PARTIES

6.     The real party in interest to the FCA *Qui Tam* claims herein is the United States of America. Accordingly, at this time, Relator is pursuing its cause of action on behalf of the United States on the FCA *Qui Tam* claims set forth herein. *See*, *e.g.*, 31 U.S.C. § 3730(b)(1).

7.     SouthernCare is a hospice care provider incorporated Delaware and headquartered in Birmingham, Alabama.

8.     SouthernCare operates hospice services in Alabama, South Carolina, Georgia, Indiana, Iowa, Kansas, Louisiana, Michigan, Mississippi, Missouri, Ohio, Pennsylvania, Texas, Virginia and Wisconsin.

9.     In 2009, SouthernCare paid $24.7 million to settle a *qui tam* case and entered into a five-year Corporate Integrity Agreement with the government. The government alleged that SouthernCare's patients were not eligible for hospice, *i.e.,* they were not terminally ill or lacked

**CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT**

medical documentation of terminal illness. In addition, the government alleged that the company marketed to potential patients with the promise of free medications, supplies, and the provision of home health aides.

10.     Medicare insures the majority of SouthernCare's patients.

11.     Medicaid insures some of SouthernCare's patients.

12.     Relator, Ms. Hamrock, is a registered nurse, and was employed by SouthernCare as a case manager and then Clinical Director for its New Castle, Pennsylvania offices from 2005 until July 18, 2012. As part of her employment with SouthernCare, Ms. Hamrock participated in regular teleconferences with SouthernCare management. The information imparted by SouthernCare management during on those calls provide the basis for Ms. Hamrock's allegation that SouthernCare's schemes are occurring on a nationwide basis.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367 and 31 U.S.C. § 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

14.     This Court has personal jurisdiction and venue over the Defendant pursuant to 28 U.S.C. §§ 1391(b) and 31 U.S.C. § 3732(a) because those sections authorize nationwide service of process and because each Defendant has minimum contacts with the United States. Moreover, Defendant can be found in, resides, and transacts business in this District.

15.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendant transacts business in this judicial district, and acts proscribed by 31 U.S.C. § 3729 have been committed by Defendant in this District. Therefore, venue is proper within the meaning of 28 U.S.C. §1391(b) and (c) and 31 U.S.C. § 3732(a).

**CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT**

16.     This action is not precluded by any provisions of the False Claims Act's jurisdictional bar set forth at 31 U.S.C. § 3730(e) *et seq.*

17.     Upon information and belief, this Complaint is not based upon allegations or transactions that are the subject of a civil suit or an administrative civil money penalty proceeding in which the United States is already a party. 31 U.S.C. §3730(e)(3).

18.     Further, under 31 U.S.C. § 3730(e)(4)(A), there has been no statutorily relevant public disclosure of substantially the same "allegations or transactions" alleged in this Complaint. Even to the extent there has been any such public disclosure, Relator meets the definition of an original source, as that term is defined under 31 U.S.C. § 3730(e)(4)(B). Specifically, Relator voluntarily disclosed to the Government the information upon which allegations or transactions at issue in this complaint are based prior to any purported public disclosure under 31 U.S.C. §§ 3730(e)(4)(A). Alternatively, Relator has knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions, and, Relator voluntarily provided the information to the Government before filing its complaint. Relator therefore qualifies as an "original source" of the allegations in this Complaint such that the so-called public disclosure bar set forth at 31 U.S.C. § 3730(e)(4) is inapplicable.

19.     Relator shall concurrently serve upon the Attorney General of the United States and the United States Attorney for the Eastern District of Pennsylvania this Complaint and a written disclosure summarizing the known material evidence and information in the possession of Relator related to the Complaint, in accordance with the provisions of 31 U.S.C. §3730(b)(2). The disclosure statement is supported by material evidence. The disclosure statement is incorporated herein by reference.

**CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT**

## MEDICARE AND MEDICAID FRAUD ALLEGATIONS

20.     Relator has direct knowledge of a host of FCA violations that persist despite SouthernCare's CIA with DOJ.

21.     The CIA required SouthernCare to maintain a Compliance Program with a Compliance Officer who made quarterly reports to the Board of Directors, and requires an annual compliance report to the Office of the Inspector General (OIG) including a summary of "reportable events" including substantial overpayments to SouthernCare. The CIA defines an overpayment as "the amount of money [SouthernCare] has received in excess of the amount due and payable under any Federal health care program requirements."

22.     The practices and incidents that Ms. Hamrock witnessed all violate Medicare regulations on their own and resulted in the systematic submission of false claims in violation of the FCA, and further violate SouthernCare's obligations under the CIA to report substantial overpayments.

### Fraudulent Admissions and Re-certifications: Extended Prognosis, Vague Diagnosis, Lack of Documentation

23.     Medicare will cover hospice services provided by SouthernCare only if the services provided are reasonable and necessary, and upon admission the Medical Director must certify that the beneficiary's prognosis is for six (6) months or fewer. (42 CFR § 418.22(b)(1) and (2)). Nevertheless, a majority of SouthernCare's patients remain on care far beyond six (6) months.

24.     Relator has direct and personal knowledge that SouthernCare's patient population regularly exceeds the 6-month prognosis. At the time of Ms. Hamrock's resignation, the following patients had been receiving long term care. For example:

**CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT**

    a.   Patient J.Z., over 4 years

    b.   Patient I.D., over 2 years

    c.   Patient S.D. nearly 2 years, does not have a terminal diagnoses but SouthernCare admitted him because his wife needs help caring for him

    d.   Patient A.D., over 1 year

    e.   Patient M.T., over 4 years

    f.   Patient J.J., over 3 years

    g.   Patient M.T., over 1 year

    h.   Patient D.K., over 3 years

    i.   Patient J.F., over 4 years

    j.   Patient F.C., over 2 years

    k.   Patient R.C., over 2 years

    l.   Patient A.B., over 3 years

25.    At the start of each period of care, a physician must certify that the beneficiary is terminally ill and support the diagnosis with clinical information and documentation that support the diagnosis. (42 CFR § 418.22(b)(1) and (2)).  After the initial period of care, the hospice physician must continually recertify the patient as terminally ill every sixty days.

26.    It defies logic that over the course of a year, two years, three years, and even four years patients continuously exhibited signs and symptoms of steady decline and disease progression for each 60 day recertification period (approximately 5 or 6 periods each year).

27.    Moreover, SouthernCare often admits patients shortly after another hospice has discharged them because the patient's prognosis extends beyond the allowable six months and

admits other patients who are elderly and infirm, but whose illnesses that have not yet reached the terminal phase. For example:

    a.  SouthernCare admitted patient A.D. with Alzheimers, but Ms. Hamrock, who was working as a case manager at the time before her promotion to Clinical Director, tried to discharge the patient from services because she was not yet in the terminal phase. The patient had the disease but could still walk and talk and was therefore was not in the terminal phase of the illness. The clinical director at the time, Camille Romeo, went out to the patient and found a minor weight loss, which he used as a pretext to overrule Ms. Hamrock's decision to discharge the patient and instead kept the patient on service. The family subsequently revoked hospice services and placed the patient in a long-term care facility where she survived for at least another two years and received therapy. The ability to follow therapy commands is inconsistent with end-stage Alzheimers.

    b.  Patient H.S. carries a diagnosis of Alzheimers. After even by SouthernCare standard's the patient could not be recertified as terminally ill, SouthernCare briefly revoked the service only to reinstate it shortly thereafter.

    c.  SouthernCare admitted Patient X.A. with a dementia diagnosis. Relator recommended changes in the patient's medications and she became responsive, alert, able to talk, recognize people and able to hold her grandchildren. Nevertheless, SouthernCare kept her on service and did not discharge her until the office secretary, who is the patient's daughter-in-law, helped the family request the discharge. As of this filing, the patient is still doing well.

**CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT**

d. Patient M.T. was admitted with Parkinsons, a chronic but not immediately fatal disease, and has gone on and off services for the past seven years.

e. Patient J.J. was admitted with Parkinsons, a chronic but not immediately fatal disease, and has been on services for at least three years.

f. Patient M.T. was admitted with dementia and yet she understands what is being said to her.  She is not terminal or in end stages.

g. Patient J.F. has prostate cancer, but has not physically declined since admission and has remained a very long term-patient.  Ms. Hamrock tried to have him discharged but I was overridden by the medical director and the patient's personal physician.

h. Patient H.L. was admitted with as end-stage cardiac diagnosis, but was not yet in the terminal stage.

28.     Whenever Ms. Hamrock refused an admission, Camille Romeo and other members of the marketing staff would say that "everyone needs jobs" and "our job is to admit patients."

29.     During her tenure as clinical director, Ms. Hamrock refused to admit Patients X.M. and X.P. She never agreed to the admissions, but Camille Romeo threatened Ms. Hamrock's job is she refused to admit them.

30.     Relator was told by management to admit patients even without medical records to support the ostensibly "terminal" diagnosis or prognosis and instead rely on what family members tell the staff.  Often patients would go an entire stay on service without complete medical records.  Complete medical records were the exception at SouthernCare.  For example:

**CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT**

a. Patient D.K.'s family refused further medical treatment when a lump emerged in the patient's breast.  There is therefore no record of whether the lump is cancer or a benign cyst.  Even so, SouthernCare admitted the patient with a breast cancer diagnosis even though there were no medical records to support the diagnosis and no changes in the breast lump over her roughly *three-year stay* on service during which time SouthernCare physicians continually recertified her as terminally ill. Such a length of stay is facially suspect because determining the end stage of cancer is highly predictable. Admissions of terminal cancer patients almost always have relatively short lengths of stay, when a patient is legitimately certified as terminal.

b. SouthernCare admitted Patient D.B. without the consent or admission paperwork. Medicaid provided D.B.'s primary insurance.

### SouthernCare Systematically Conspired to Abuse the Elevated Level of Care - and Billing - Designations

31.     Relator has first-hand knowledge that SouthernCare and Ellwood City Hospital (in Ellwood City, PA) agreed to put several patients on General Inpatient care (GIP).  Medicare pays higher per diem rates for GIP care, due to the purported need for a hospice provider to provide more expansive and expensive patient care.

32.     Indeed, a Medicare hospice provider is generally reimbursed by the United States at one of four fixed *per diem* rates, dependent on the level of care, as described below:

- **Routine Home Care** – care provided to a patient's residence or at a nursing home;

- **Continued Attendance at Home** – care at home during a "period of crises" which primarily consists of continuous nursing care. An hourly rate may be used if nursing care is provided at less than a 24 hour basis;

- **General Inpatient Care** – covers inpatient care when necessary for pain control or acute/chronic system management which cannot be provided in other settings; and,

- **Inpatient Respite Care** – covers care provided by a certified hospice program at an unapproved inpatient facility.

33.    In 2012, GIP earned a rural Pennsylvania hospice facility $671.84 per day, rather than the $151.03 daily rate the Routine Home Care earns.  Relator has first-hand knowledge that these patients were not appropriate for GIP.  Rather, they should no longer have been in the hospital but their families did not want to take them home.  Even so, SouthernCare would bill for costly GIP services and partially reimburse the hospital despite the fact that these patients did not qualify for costly in-hospital hospice care.

34.    Relator avers that SouthernCare conspired with hospitals to cause false claims for GIP service to be submitted to the Medicare and Medicaid program.

35.    For example, Relator has direct knowledge that Leanna Hoffman, SouthernCare's community director, and Kathleen Martintino, a SouthernCare community relations specialist, worked with with Cathy Small, a social worker at Elwood Hospital and others to designate patients as GIP service recipients even though the patients did not require that level of care.

### SouthernCare's Marketing Plan and Internal Quota System Violated the Anti-Kickback Statute

36.    The SouthernCare marketing arm treats nursing home physicians and their staff to pizza luncheons and hosts ice cream socials with the express purpose of cultivating referrals.

37.    The marketing department has told skilled nursing facilities that hospice would supply personal care items -- like nutritional supplements and free diapers -- to save the facility money, and had a "menu" that illustrated the potential savings to the facility if they referred a patient to hospice care.

38. The provision of these in-kind gifts with the expressed intent of procuring the referral of Medicare business in exchange violates the Anti-Kickback Statute.

39. SouthernCare has a monthly marketing quota of roughly 14 new Medicare patients a month for the New Castle office.

40. Ed Latos, a former marketing team member, was fired for not meeting the quota.

41. SouthernCare executive Jeff Lang would frequently say on nationwide staff conference calls "You're only as good as the number you have right now," meaning admission rates. He would goad different offices, says "Oh, come on, Youngstown made their goals in the middle of the month, what's wrong with you, New Castle?"

42. Patient X.P. did not qualify for services, but was the marketing director's aunt so she was admitted to help meet the required quota that month.

43. Admission nurses, who work in the marketing rather than medical chain of command, frequently manipulate patient diagnoses.

44. Medicare covers the cost of medication associated with the primary diagnosis. Accordingly, a hospice referral means families and facilities can save money on medications. In order to get admissions to meet quotas, nurses would admit a patient with cardiac disease and intentionally falsify an "end-stage cardiac" diagnosis to lure families and facilities into referring patients to SouthernCare as a way to alleviate their expenses. For example, Patient L.D. was admitted with an end-stage cardiac diagnosis, and yet he still gardens, drives, and cares for his wife who has cancer. His family requested that he be admitted after the marketing department told the family they could save him money on his medications.

45. On other occasions, SouthernCare would manipulate a diagnosis not to save families and facilities money, but to save itself time and effort. Cardiac admissions require less

effort than renal admissions.  For example, Patient Y.D. was on dialysis, but was exhausted by

the treatment and elected to stop treatment although doing so would lead to death.  When she

stopped, she was admitted to hospice.  Even though she had a well-documented kidney

condition, she was admitted under end-stage cardiac.  However, the diagnosis did not fit -- her

ejection fraction (EF) was close to 49 percent and it needs to be less than 25 percent to qualify

for end-stage cardiac.

46.     SouthernCare often marketed its services at dialysis centers where patients were

allowed to return for treatment even after they began hospice services, often having been admitted

under a separate diagnosis.

**COUNT I**

**Federal False Claims Act Claim pursuant to 31 U.S.C. § 3729 *et seq.***
**Intentionally Presenting Claims for Payment to the United States for Patients Who Did Not**
**Qualify for Admission to Hospice Services[2]**

47.     Relator reasserts and incorporates by reference all paragraphs set forth above as if

restated herein.

48.     Pursuant to 42 C.F.R § 418 generally and specifically sections 418.1; 418.20;

418.22; 418.25; 418.50; 418.54; 418.74; 418.200; 418.202; 418.301-311, SouthernCare must

meet requirements for certification of patients for hospice care to qualify for payment from the

federal government. Specifically, § 418.22 requires a medical certification of terminal illness by

a physician and that the certification be accompanied by documentation to support a six-month

prognosis.

---

[2] For all unlawful conduct for which Defendant is liable under this Count that occurred on or before May 20, 2009, the date on which Congress amended and renumbered the Federal False Claims Act pursuant to the Fraud Enforcement and Recovery Act ("FERA"), Pub.L.No. 111-21, §4, 123 Stat. 1617, 1621 (2009), this Complaint should be deemed to include violations of the FCA prior to the FERA amendments, specifically, 31 U.S.C. §3729(a)(1) and(2).

**CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT**

49.     Relator has first-hand knowledge of numerous patients that SouthernCare admitted to hospice care who did not meet the criteria for hospice admission because they had not reached the end-stage of their illness.

50.     Relator has first-hand knowledge of numerous patients that SouthernCare admitted to hospice without proper consent paperwork as required by 42 CFR § 418.24.

51.     Relator has first-hand knowledge that patients were admitted not so that SouthernCare could provide end-of –life care, but so SouthernCare employees could fulfill their monthly admissions quotas.

52.     SouthernCare has submitted claims and received payment from the United States through Medicare and Medicaid programs for hospice services provided patients despite the fact that patients did not meet the requirements for hospice admission.  Each such claim was false and gives rise to liability under the FCA.  Furthermore, the submission of false claims for hospice services constitutes a material violation of SouthernCare's CIA, which requires accurate billings and the reporting of any overpayment.

53.     Based upon Relator's interaction with SouthernCare management, she avers that SouthernCare's has implemented the same practices of intentional non-compliance and false billing at all of its other facilities throughout the country.

54.     On this basis she further avers that SouthernCare's corporate offices are aware of the non-compliant practices and have not taken action to accomplish compliance, which would substantially reduce corporate profits.

55.     At all times relevant to this Complaint, SouthernCare acted with the requisite intent.

**CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT**

56.     The United States has been damaged by all of the aforementioned

misrepresentations and failures to comply with requisite laws and regulations in an as of yet

undetermined amount.  SouthernCare knowingly made false claims in the form of reimbursement

bills to officials of the United States for the purpose of obtaining compensation.

57.     SouthernCare's corporate offices are aware of the non-compliant practices and

have not taken action to accomplish compliance which would substantially reduce corporate

profits.

**COUNT II**
**Federal False Claims Act Claim pursuant to 31 U.S.C. § 3729 *et seq.*
Presenting Claims for Payment to the U.S. Government for Unqualified Patients
Admitted and Re-certified[3]**

58.     Relator reasserts and incorporate by reference all paragraphs set forth above as if

restated herein.

59.     In addition to, and often in conjunction with; its practice of admitting and billing

the United States of America for Hospice services for patients who do not qualify for hospice

services, SouthernCare routinely re-certified patients unqualified for hospice care after their

initial 90-day period.

60.     Relator has first-hand knowledge of SouthernCare re-certifying numerous patients

to hospice care even though they did not meet the criteria for hospice re-certification.

61.     For each of the representative patients described above, SouthernCare submitted

claims and received payment from the United States through the Medicare and Medicaid

---

[3] For all unlawful conduct for which Defendant is liable under this Count that occurred on or before May 20, 2009, the date on which Congress amended and renumbered the Federal False Claims Act pursuant to the Fraud Enforcement and Recovery Act ("FERA"), Pub.L.No. 111-21, §4, 123 Stat. 1617, 1621 (2009), this Complaint should be deemed to include violations of the FCA prior to the FERA amendments, specifically, 31 U.S.C. §3729(a)(1) and (2).

**CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT**

programs for hospice services provided to each patient despite the fact that each patient did not meet the requirements for hospice re-certification.

62.     This practice also violates the overpayment reporting requirements in the CIA with DOJ to which SouthernCare is bound.

63.     The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount. With respect to the aforementioned misrepresentations and failures to comply, SouthernCare knowingly made false claims to officials of the United States for the purpose of obtaining compensation.

64.     Based upon Relator's interaction with SouthernCare management, she avers that SouthernCare's has implemented the same practices of intentional non-compliance and false billing at all of its other facilities throughout the country.

65.     On this basis she further avers that SouthernCare's corporate offices are aware of the non-compliant practices and have not taken action to accomplish compliance, which would substantially reduce corporate profits.

66.     At all times relevant hereto, SouthernCare acted with the requisite intent.

## COUNT III

### Defendant's Violations of the Federal False Claims Act, 31 U.S.C. §3729(a)(1)(G)Making, Using or Causing to be Made or Used, a False Record or Statement Material to an Obligation to pay or Transmit Money or Property to the United States or  Concealing, Improperly Avoiding or Decreasing an Obligation to Pay or Transmit Money or Property to the United States[4]

---

[4] For all unlawful conduct for which Defendant is liable under this Count that occurred on or before May 20, 2009, the date on which Congress amended and renumbered the Federal False Claims Act pursuant to the Fraud Enforcement and Recovery Act ("FERA"), Pub.L.No. 111-21, §4, 123 Stat. 1617, 1621 (2009), this Complaint should be deemed to include violations of the FCA prior to the FERA amendments, specifically, 31 U.S.C. §3729(a)(7).

**CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT**

67.     Relator reasserts and incorporate by reference all paragraphs set forth above as if restated herein.

68.     This is a claim brought by Relator and the United States to recover treble damages, civil penalties and the cost of this action under the Federal False Claims Act, 31 U.S.C. § 3730, for Defendant's violations of 31 U.S.C. § 3729 *et seq.*

69.     The Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(G) provides:

"Liability for certain acts. Any person who--

> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government ..."

*Id.* The term "obligation" means:

> "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, form a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment..."

31 U.S.C. § 3729(b)(3).

70.     By virtue of the above-described acts, among others, Defendant knowingly made, used, or caused to be made or used false records or statements, and continue to do so, in violation of 31 U.S.C. § 3729(a)(1)(G). Defendant knew that it had been overpaid by Medicare for years as a result of its schemes, yet it took the required and appropriate steps to satisfy the obligation owed to the United States, refund or return such overpayments, or to inform Medicare of the overbilling, and instead continued to retain the same, and to overbill the Medicare program.

71.     As a result of Defendant's violations of 31 U.S.C. § 3729 (a)(1)(G), the United States has suffered substantial losses in an amount that exceeds tens of millions of dollars, and

**CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT**

therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false record and/or statement made or used or caused to be made or used by Defendant.

**COUNT IV**
**Federal False Claims Act pursuant to 31 U.S.C. § 3729 *et seq.*, Engaging in Kickback Schemes**

72.     Relator reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

73.     By virtue of the acts described above, Defendant knowingly engaged in kickback schemes by marketing hospice services covered by Medicare under 42 C.F.R. § 418.202 to facilities and families inducing them to prematurely refer patients as a way to save the facilities and families money.  Once SouthernCare knowingly, prematurely admitted those patients to hospice care, it presented false or fraudulent claims to the United States Government for the payment of medical services as described above, in violation of the AKS.

74.     By virtue of the acts described above, Defendant knowingly engaged in kickback schemes for the purpose of inducing, and did induce, the presentation of false or fraudulent claims to the United States Government for the payment of medical services as described above in violation of Section 1877 of the Social Security Act.

75.     Furthermore, as a direct and proximate result of SouthernCare's violations of the Anti-Kickback Statute described above, SouthernCare caused to be submitted, or submitted, false claims and false records material to a false claim that give rise to liability under the FCA and which constituted reportable overpayments under the terms of SouthernCare's CIA with DOJ.

**COUNT V**

**Defendants' Violations of the Federal False Claims Act, 31 U.S.C. §3729(a)(1)(C)**

**CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT**

## Conspiracy[5]

76.     Relator incorporates by reference each and every of the foregoing paragraphs as if fully set forth herein.

77.     This is a *qui tam* action brought by Relator and the United States to recover treble damages, civil penalties and the cost of this action under the Federal False Claims Act, 31 U.S.C. §3730 for Defendants' violations of 31 U.S.C. § 3729 *et seq.*

78.     The Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(C) provides:

"Liability for certain acts. Any person who—

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); …is liable to the United States Government for a civil penalty of not less than $ 5,500 and not more than $11,000, plus 3 times the amount of damages which the Government sustains because of the act of that person, …"

*Id.*

79.     In violation of 31 U.S.C. § 3729(a)(1)(C), by the foregoing acts and omissions, Defendant conspired to violate 31 U.S.C. § 3729(a)(1)(A), (B) and (G).

80.     By virtue of the acts described above, Defendant entered into a conspiracy with healthcare providers, including Elwood Hospital, to defraud the United States by getting false and fraudulent GIP designated claims covered by Medicare under 42 C.F.R. § 418.302 allowed or paid.

---

[5] For all unlawful conduct for which SouthernCare is liable under this Count that occurred on or before May 20, 2009, the date on which Congress amended and renumbered the Federal False Claims Act pursuant to the Fraud Enforcement and Recovery Act ("FERA"), Pub.L.No. 111-21, §4, 123 Stat. 1617, 1621 (2009), this Complaint should be deemed to include violations of the FCA prior to FERA, specifically, 31 U.S.C. §3729(a)(3).

**CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT**

81. By the foregoing acts and omissions, Defendant took action in furtherance of its conspiracies. Said actions constitute violations of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

82. As a consequence of Defendants' violations of 31 U.S.C. § 3729 (a)(1)(C), the United States has suffered substantial losses, and is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false claim Defendants conspired to get paid or allowed.

## PRAYER FOR RELIEF

WHEREFORE, the United States is entitled to damages from SouthernCare in accordance with the provisions of 31 U.S.C. §§ 3729-3733, and Relator request that judgment be entered against Defendants, ordering that:

a. Defendant cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq.;*

b. Defendant pays an amount equal to three times the amount of damages the United States has sustained because of Defendant's actions, plus a civil penalty against Defendant of not less than $5,000 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

c. Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

e. Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d);

f. The United States and Relator be granted all such other relief as the Court deems just and proper.

**CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT**

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demand a jury trial.

Respectfully Submitted,

KENNEY & McCAFFERTY, P.C.

BY: _____

Brian P. Kenney, PA ID No.: 32944
M. Tavy Deming, PA ID No.: 83190
Emily C. Lambert, PA ID No.: 205073
1787 Sentry Parkway West
Building 18, Suite 410
Blue Bell, PA 19422
(215) 367-4333
Fax: (215) 367-4335
Email: tdeming@kenneymccafferty.com

David Scher, *Pro Hac Vice to be filed*
R. Scott Oswald, *Pro Hac Vice to be filed*
*Counsel for Relator*

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2803
(202) 261-2835 (facsimile)
dscher@employmentlawgroup.com
soswald@employmentlawgroup.com

**CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT**